# Illinois Official Reports

## Appellate Court

---

*People v. Cunningham*, 2018 IL App (1st) 153367

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GIOVANNI CUNNINGHAM, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-15-3367 |
| Filed | June 8, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-8635; the Hon. Thomas M. Davy, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Eric E. Castaneda, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Kathryn A. Schierl, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE CONNORS delivered the judgment of the court, with opinion.<br>Justices Cunningham and Delort concurred in the judgment and opinion. |

**OPINION**

¶ 1        Defendant, Giovanni Cunningham, was charged with, *inter alia*, unlawful use of a weapon by a felon (UUWF) and aggravated use of a firearm after he was observed loading a shotgun by Chicago police officers. After a bench trial, defendant was convicted of the aforementioned offenses and sentenced to eight years' imprisonment. Defendant appeals, arguing that his due process rights were violated where police failed to follow the proper inventory procedures for material, exculpatory evidence and ultimately destroyed said evidence even after receiving a discovery request from defendant. For the reasons that follow, we affirm the trial court's decision.

¶ 2                                BACKGROUND

¶ 3        On April 16, 2014, defendant was arrested and charged with one count of armed habitual criminal, two counts of UUWF, six counts of aggravated unlawful use of a weapon, and two counts of unlawful use of a weapon.

¶ 4        On July 10, 2014, defendant filed a motion for discovery, asking that the State disclose and produce certain evidence. In relevant part, defendant's motion requested that the State produce the following:

> "A list of all physical property that the State intends to use at the time of trial, including:
>
> a) A list of all physical property in the possession of law enforcement officials;
>
> b) Date and time the property was acquired;
>
> c) Location from which property was acquired;
>
> d) What person or persons first took the property into their possession;
>
> e) Reports made by law enforcement authorities pertaining to this property, including scientific reports, etc.;
>
> f) That such property be made available to the defense for inspection before trial."

¶ 5        Defendant waived his right to a jury trial, and his bench trial began on June 11, 2015. The State called three witnesses: Officers Caribou, Mostowski, and Meadows. Officer Caribou testified that on April 16, 2014, at approximately 2:32 p.m., he and his partner, Officer Mostowski, were on duty conducting narcotics surveillance of 6951 South Indiana Avenue, which was an abandoned house. Officer Caribou stated that he and his partner were on the porch of the house next door when they observed three individuals walking to the rear alley of the abandoned house. The officer estimated that he and his partner were approximately 10 to 15 feet away from the rear of the building, and stated that they had a clear view. Officer Caribou further stated that as the three individuals walked to the rear of the building, he observed one of them, who he subsequently identified in court as defendant, take a shotgun from the open doorway at the rear of the building. Officer Caribou described defendant on that date as wearing blue jeans, a black and red Bulls coat, and a Mohawk haircut, which he agreed was "unique." He estimated that defendant was about 5 feet, 5 inches tall. Officer Caribou also stated that the other two individuals were wearing a black hoodie and a blue hoodie, but neither had a Mohawk haircut.

¶ 6    Officer Caribou testified that he then observed defendant begin to load the shotgun with ammunition that he removed from either his pants pocket or jacket pocket. The officers then approached the three individuals and announced their office as Chicago police when they were about 10 feet away, and all three individuals fled. Officer Caribou further stated that the two individuals who were wearing hoodies fled back into the alley, but defendant went through the open doorway into the abandoned house. Officer Caribou followed defendant into the house and observed defendant drop the shotgun on the bottom of the staircase. Defendant proceeded up the stairs, and Officer Caribou testified that he then secured the shotgun, which was loaded with four rounds and one in the chamber. Officer Caribou stated that he then continued to run about halfway through the building when he heard his partner on the radio state that he observed defendant go out the front door and onto the next block. Officer Caribou secured the shotgun in his vehicle and joined up with his partner. At this point, the officers had lost sight of defendant. The officers then put out information over the radio dispatch that they were looking for three individuals.

¶ 7    Officer Caribou further testified that at approximately 2:48 p.m. on that same date, he received notice from dispatch that other officers had detained a possible offender. Officer Caribou then traveled to 6926 South Michigan Avenue, which he testified was approximately one block away from where he initially observed defendant with the shotgun. Officer Caribou stated that upon arriving at that location, he saw another officer (Officer Meadows) and his partner detaining defendant, whom Officer Caribou recognized as "the individual with the mohawk haircut, the Chicago Bulls clothes that had the shotgun at the abandoned house." Officer Caribou further testified that defendant was not wearing the Chicago Bulls jacket at that time but was wearing blue jeans, a shirt, and "obviously his mohawk." Officer Caribou stated that defendant was subsequently taken to the third district police station, where he and his partner, Officer Mostkowski, spoke to defendant. Officer Caribou testified that at approximately 3:15 p.m., defendant was advised of his *Miranda* rights by Officer Mostowski. Officer Caribou also testified that defendant made a statement that "the DOD was in the area shooting, so he went to go get the shotgun to protect him and his friends." Officer Caribou testified that "DOD" was slang for a gang in Chicago. The officer also stated that he inventoried the shotgun he recovered, which he found out to be a 12-caliber gauge shotgun. Officer Caribou testified that defendant gave his home address as 9356 South Martin Luther King Drive, and that his date of birth was July 25, 1990.

¶ 8    On cross-examination, Officer Caribou testified that when he first saw defendant, he recognized the following distinguishing features, other than the Bulls jacket: "[b]lue jeans, medium skin, and roughly about five-five in height." Officer Caribou described defendant's hair as "a fresh clean mohawk haircut." Counsel for the State confirmed with Officer Caribou that he inventoried both the shotgun and the Bulls jacket and asked the officer if he knew where the jacket currently was. Regarding the jacket's location within the Evidence and Recovered Property Section of the Chicago Police Department (ERPS), Officer Caribou stated that "[i]f it's still inventoried, it should be down in ERPS. Usually for something like this we would put a hold on it, so if it's still on a hold, it's in ERPS which is at Homan."

¶ 9    On redirect examination, Officer Caribou identified the arrest report, which contained a photo of defendant, and testified that the photo depicted defendant's unique-looking Mohawk on the date he observed defendant with the shotgun. The following relevant questioning then occurred:

"Q. Officer I don't know if you will know the answer to this, but Chicago Police when personal property of a Defendant such as the clothing that they are wearing is inventoried and that property is not picked up by a Defendant, do you know whether or not that property gets destroyed within a certain amount of time?

A. Like I said earlier, I'm positive I put a hold on this because we gave a description of him wearing it, so if there is a hold on it, it should be at Homan Square where they hold the property in ERPS.

Q. But you don't know what happens to it otherwise, correct?

A. No.

Q. Okay. Thank you.

But you did inventory the Bulls jacket in question, is that correct?

A. I am pretty positive I did; yes.

Q. And the inventory for that was under 13151446, is that correct?

A. Correct."

¶ 10    The State next called Officer Mostowski to testify. Officer Mostowski testified to substantially the same events as his partner, Officer Caribou, with a few exceptions. Officer Mostowski testified that when he first observed defendant, he saw him wearing "[a] Bulls jacket, blue jeans, and he had a mohawk." He further testified that the other two individuals who were with defendant were wearing a black hoodie and a blue jacket. Officer Mostowski testified that after he and his partner approached the individuals and announced their office, the individuals ran. The officer stated that he lost sight of defendant after defendant ran into the house, with Officer Caribou following after defendant. Officer Mostowski testified that after losing sight of defendant, he ran to the front of the house and then saw defendant again when defendant ran out of the front of the house. Officer Mostowski stated that he saw defendant run westbound towards 69th Street and Michigan Avenue. The officer again lost sight of defendant and met up with his partner, who then had the shotgun in his possession. Officer Mostowski confirmed that the shotgun Officer Caribou recovered was the same one they had observed defendant holding.

¶ 11    Officer Mostowski further testified that he and Officer Caribou received information over dispatch that a suspected offender had been detained at 6926 South Michigan Avenue, which was about a block away. When Officer Mostowski arrived at that location, he recognized defendant as the same person that he had seen with a shotgun moments before at 6951 South Indiana Avenue. Officer Mostowski stated that defendant was no longer wearing the Bulls jacket at that time but still had on jeans and the same Mohawk haircut. Officer Mostowski testified that he recognized defendant's face and had gotten a clear view of his face because defendant had looked "directly in [his] direction." Officer Mostowski stated that another officer, Officer Meadows, showed him a Bulls jacket that he had recovered, and Officer Mostowski recognized it as the jacket that defendant had been wearing. Back at the third district station, Officer Mostowski and his partner advised defendant of his *Miranda* rights. Officer Mostowski testified that defendant made a statement to the officers that, "the DOD[,] Black Disciples, were coming around the block with guns, so he wanted to protect himself and his friends with the shotgun."

¶ 12    On cross-examination, Officer Mostowski confirmed that it was officers other than him and his partner who recovered the Bulls jacket but that he and his partner inventoried the

jacket. Officer Mostkowski also testified that when he spoke to defendant at the third district station, he got defendant's basic information, and stated that he thought he got the information off of defendant's identification (ID) card. When asked if he would have inventoried defendant's ID, Officer Mostkowski said he would not have and instead would have "[l]et him take it. Take it to the lock-up with him."

¶ 13    The State next called Officer Meadows, who testified that on April 16, 2014, sometime after 2:30 p.m., he was on patrol with his partner. Around that time, he heard over his dispatch radio the description of an offender that fellow officers were chasing. Officer Meadows stated that the description was of "a male black about five-five with a Chicago Bulls jacket on, medium complected, hairstyle of a mohawk." Officer Meadows testified that while he and his partner were touring the area, at approximately 6830 South Michigan Avenue, he saw a Chicago Bulls jacket underneath a car in the alley, which was "in the area of the last direction that I heard the guys give out of where the offenders [*sic*] was possibly going." Officer Meadows testified that he did not recover the jacket at that time and instead continued to search the area, believing that the subject offender was nearby in light of the jacket's location.

¶ 14    Officer Meadows further stated that he observed someone who matched the description given over dispatch, and whom he identified in court as defendant, on the rear porch of the building at 6926 South Michigan Avenue, which was the building next to where the officer saw the Bulls jacket under the car. Officer Meadows testified that when he saw defendant on that rear porch, he was wearing blue jeans and had a Mohawk hairstyle. Officer Meadows then announced his office and told defendant to come to him. Defendant did not immediately comply so the officer took steps toward defendant, grabbed him, and placed defendant in custody. Officer Meadows testified that he then told dispatch that he had detained a possible offender. He also stated that Officers Caribou and Mostkowski came to the location where he had detained defendant and they identified him as the suspect they had been looking for. Officer Meadows testified that his partner then recovered the jacket from underneath the car and Officers Caribou and Mostkowski took the jacket with them and defendant.

¶ 15    On cross-examination, Officer Meadows testified that he did not go through the pockets of the Bulls jacket before handing it over to Officers Caribou and Mostkowski. Also regarding the jacket, the following relevant exchange occurred:

"Q. Did you see your partner [go through the pockets of the jacket]?

A. I remember him holding the jacket. I can't say if he went through the pockets or anything because I had the offender, so—

Q. So, you never found an I.D. of someone else in that jacket, is that correct?

A. No, my partner went through the jacket.

Q. And he didn't show you any identification recovered from that jacket?

A. I saw an I.D. I saw an I.D. card.

Q. From the jacket?

A. I don't know. I think it came from the jacket. I'm not sure. I didn't recover it from the jacket.

Q. Did you ever see the information on that card?

A. Yes."

Defense counsel then asked Officer Meadows, "Now the identification that you recovered, that wasn't [defendant's], was it?" The State objected on the basis of hearsay, the court sustained the objection, and the officer did not provide an answer.

¶ 16    The parties stipulated to an Illinois State Police certification that stated defendant did not have a valid FOID card. The parties also stipulated that the shotgun in question was originally inventoried under inventory No. 13151436, tested at the police forensics lab, and then re-inventoried under No. 13152429.

¶ 17    The trial was commenced and continued to July 13, 2015. On that date, the State rested its case-in-chief and the defense informed the court that it was filing a motion to dismiss or strike evidence based on destruction of evidence. Defendant's motion to dismiss or strike evidence argued that because defendant had filed a motion for discovery, the State was on notice that evidence must be preserved. The defendant's motion further asserted that the police's failure to preserve the Bulls jacket that defendant was observed wearing on the date of his arrest required either dismissal of the charges or the striking of any testimony regarding the jacket.

¶ 18    The State filed its response on August 6, 2015, stating that "according to ICLEAR,[1] the Bulls coat in question was destroyed by ERPS along with the other 'personal property' of the Defendant (cell phones). No explanation or date of destruction is provided." The State argued that although the defense filed a general discovery motion, the defense never filed for a preservation order for the Bulls jacket. The State further asserted that defendant's motion should be denied because he failed to show how the inadvertent destruction of the jacket prejudiced defendant, who was not wearing the jacket when he was arrested, and was identified by his "extremely unique Mohawk hair style rather than reliance on an item of clothing." Additionally, the State contended that defendant sought the two most severe sanctions, which were not warranted by the officers' conduct in this case.

¶ 19    On August 12, 2015, the defense sought and was granted leave to amend its motion to only seek dismissal as relief. As a result, the court struck part of defendant's prayer for relief, namely, the portion wherein defendant asked that testimony related to the destroyed evidence be stricken. Thereafter on that date, the parties orally argued the motion to dismiss. Defense counsel argued that the jacket could have been exonerating because "it could go against how it was described by police officers. It could be a very large jacket that did not fit [defendant]. And it could have this identification card in it, which could be presented as evidence exonerating [defendant]."

¶ 20    The court denied defendant's motion to dismiss, noting that the Bulls jacket was marked as available for return to owner, and even if the police attempted to notify defendant at his home, he would not have received the notice because he was incarcerated. The record on appeal contains an inventory record sheet for the Bulls jacket, in which the "property available for return to owner" box is checked. The court further explained its decision as follows:

> "But since it is not a case where the item was to be held for investigation, and or evidence, it was a return to the owner. Or it should have been marked that way, is also another story.

    [1] The acronym "ICLEAR" signifies the Illinois Citizen and Law Enforcement Analysis and Reporting database, which is a "system that stores data relating to criminal offenders in Illinois." *Samoylovich v. Montesdeoca*, 2014 IL App (1st) 121545, ¶ 7.

The recent Illinois Supreme Court case involving the destruction of evidence, specifically regarding a video ***. That is [*People v. Kladis*, 2011 IL 110920].

In that case[,] the Illinois Supreme Court held that the proper remedy there was the officer could only testify to events other than those on the recording.

The defense, in its motion, has stricken that prayer for relief. As to the striking of any testimony regarding the applicable statute for dismissal of the case.

As the State has pointed out, at the time the defendant was arrested, the identification was not based on the Bulls jacket, since he was not wearing [it] at the time. There was a description[.] Officer Caribou was in very close proximity to the defendant. Observed him there.

Based on what has been presented, as far as the motion, the fact that the jacket was not destroyed, having been marked for evidence or investigation, but rather was destroyed, at some point, after having been marked as property available for return.

At this time the Motion to Dismiss would be denied."

¶ 21    The defense then made a motion for a directed finding, which the court denied. The parties entered a stipulation that the Bulls jacket inventoried in this matter was destroyed and that the parties had "no idea of the circumstances surrounding the destruction." The parties also stipulated that the defense received defendant's clothing from the Cook County Sheriff's Department on April 17, 2014, including "one shoes [*sic*] multicolored, one pant, black, and two shirts multicolored."

¶ 22    Defendant waived his right to testify, and the defense rested its case without presenting any evidence. Closing argument was thereafter presented. In closing, defense counsel emphasized that although all three testifying officers stated that defendant was wearing blue jeans on the date in question, the clothing received from the sheriff demonstrated that defendant's pants were actually black. The court asked if the defense would like to examine the pants, and defense counsel replied in the affirmative. Upon closer inspection, the court described the pants as "True Religion brand jeans." In its rebuttal, the State asserted, "It appears defendant is wearing jeans when arrested, just black jeans, not blue jeans, as the officer[s] testified to."

¶ 23    In delivering its finding of guilt on all counts, the trial court stated that it thought Officer Caribou's testimony, alone, was enough to meet the State's burden. The court noted that the term "blue jeans" is a generic term that often encompasses jeans that are not just "traditional Levi Strauss blue." After considering the totality of the testimony, the court found that the State established its case beyond a reasonable doubt, specifically because defendant was apprehended within a very short period of time and only one block over from where he was observed with the shotgun. Additionally, the court noted that defendant matched the description in terms of "height, hairstyle, as well as facial observations, made by Officers Caribou and Mostkowski."

¶ 24    On September 14, 2015, defendant filed a motion for a new trial, which was granted in part and denied in part. Defendant's motion argued that the court erred in denying his motion to dismiss; the officers' testimony contradicted one another; defendant was wearing black, not blue, jeans when arrested; and that the State failed to prove an element on counts IV, V, VI, X, and XI. The trial court granted the motion in part by dismissing counts IV, V, and VI because the statute involved made reference to "handgun, pistol, or revolver" but defendant was caught with a shotgun. The court also dismissed counts X and XI because there was no evidence

presented as to the length of the shotgun. The motion was denied as to all other counts, and the court clarified that there was a finding of guilt as to counts II, III, VII, VIII, and IX.

¶ 25 Also on that date, the court conducted a sentencing hearing and ultimately sentenced defendant to eight years' imprisonment. Defendant subsequently filed a motion to reconsider sentence, which was denied.

¶ 26 Defendant filed his timely notice of appeal on October 13, 2015.

¶ 27                                    ANALYSIS

¶ 28 Defendant raises the following arguments on appeal: (1) his due process rights were violated under both federal and state laws when the police disposed of the Bulls jacket and an ID, which were pieces of evidence that could exonerate defendant and (2) his eight-year sentence was an abuse of the trial court's discretion as excessive in light of defendant's rehabilitative potential. However, in defendant's reply brief, he informed this court that he "has completed his prison sentence and consequently respectfully withdraws Argument II, which asked for a new sentencing hearing." Thus, we only address defendant's first argument regarding the destruction of evidence, an alleged discovery violation, that he asserts violated his due process rights.

¶ 29 "A discovery violation may be analyzed as either a due process violation under *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), or under Illinois Supreme Court Rule 415(g)(i) (eff. Oct. 1, 1971)." *People v. Borys*, 2013 IL App (1st) 111629, ¶ 17.

¶ 30                              Due Process Violation

¶ 31 Defendant asserts that his due process rights were violated when the police acted in bad faith by not following proper procedure and destroying the Bulls jacket, an essential piece of evidence that was not otherwise available. The State responds that the trial court properly denied defendant's motion to dismiss because the Bulls jacket and ID were not materially exculpatory evidence and were only inadvertently destroyed. We agree with the State and find that the trial court properly denied defendant's motion to dismiss.

¶ 32 In this case, defendant filed a motion to dismiss based on destruction of evidence, arguing that because defendant had filed a motion for discovery, the State was on notice that the jacket should have been preserved. The defendant initially contended that failure to preserve the jacket required either dismissal of the charges or the striking of any testimony regarding the jacket. However, defendant was subsequently granted leave to amend his motion to omit his request to strike all testimony regarding the jacket. Thus, the only sanction defendant sought before proceeding to hearing on the motion was dismissal of the charges. The trial court denied defendant's motion to dismiss, noting that the Bulls jacket was marked as available for return to owner. The court also stated that, in *Kladis*, the proper remedy was excluding testimony regarding the destroyed evidence, but that defendant had withdrawn his request for such relief here. Additionally, the trial court pointed out that defendant was not even wearing the Bulls jacket at the time he was arrested.

¶ 33 When considering the destruction of evidence, Illinois courts have applied the analysis set forth in *Youngblood*. *People v. Sutherland*, 223 Ill. 2d 187, 235 (2006). In *Youngblood*, the defendant was charged with kidnapping and sexually assaulting a minor, but the police failed to refrigerate the victim's semen-stained clothes or timely test the stains. *Youngblood*, 488 U.S.

at 52-53. The State did not present any scientific identity evidence, but the victim had identified the defendant, and the defendant was convicted. *Id.* at 53-54. The Supreme Court noted that the police do not have "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution" and held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58. However, prior to reaching this conclusion, the Court stated, "The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady* [*v. Maryland*, 373 U.S. 83 (1963)], makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence." *Id.* at 57.

¶ 34    Defendant argues that the Bulls jacket and ID were "key piece[s] of evidence" and were exculpatory because they could have established misidentification. The State responds that the jacket and ID were "borderline irrelevant" and thus were only potentially useful evidence. We agree with the State. Defendant was not wearing the jacket when he was detained, and shortly thereafter, he was identified by Officers Caribou and Mostowski as being the individual they had just observed loading the shotgun. There is no evidence that Officers Caribou and Mostkowski were shown the jacket that Officer Meadows recovered from under the car *before* identifying defendant as the individual they were looking for. Thus, there is no evidence that the Bulls jacket played any role in defendant's identification by Officers Caribou and Mostowski. Further, Officer Mostkowski unambiguously testified that he recognized defendant's face and had gotten a clear view of his face because defendant had looked "directly in [his] direction." We also reject defendant's contention that perhaps the jacket would be too big or that someone else's ID was in the pocket. This is mere speculation, and the record does not support this proposition. Even if the jacket was big on defendant or the ID belonged to someone else, that does not make either item exculpatory in light of the clear, uncontradicted identification testimony from the officers in this case, which was not based on defendant wearing the Bulls jacket or the information on the ID. In fact, we can imagine a scenario where the testimony regarding the jacket and ID were excluded and believe the State would still meet its burden in proving defendant's guilt beyond a reasonable doubt. As such, we conduct the rest of our analysis based on our finding that the destroyed evidence here was merely potentially useful, rather than exculpatory.

¶ 35    We now turn back to setting forth relevant precedent. In *People v. Newberry*, 166 Ill. 2d 310, 315 (1995), the Illinois Supreme Court arguably carved an exception to *Youngblood* for situations where the inadvertently lost or destroyed evidence would have been decisive to the outcome of the case. In *Newberry*, a police field test resulted in no indication of cocaine present in the substance but a lab test found the presence of cocaine. *Id.* at 312. The substance at issue was destroyed before the defendant could test it, and there was no credible evidence of bad faith by the government. *Id.* at 312-13. Our supreme court found *Youngblood* distinguishable because the defendant's ability to test the substance at issue was "essential to and determinative of the outcome of the case," and the defendant did not "have any realistic hope of exonerating himself absent the opportunity to have [the substance] examined by his own experts." *Id.* at 315.

¶ 36    In *Illinois v. Fisher*, 540 U.S. 544 (2004) (*per curiam*), the United States Supreme Court specifically rejected *Newberry*'s exception to *Youngblood* when applied in the context of federal due process analysis. The Court explained,

"We have never held or suggested that the existence of a pending discovery request eliminates the necessity of showing bad faith on the part of police. Indeed, the result reached in this case demonstrates why such a *per se* rule would negate the very reason we adopted the bad-faith requirement in the first place: to 'limi[t] the extent of the police's obligation to preserve evidence to reasonable grounds and confin[e] it to that class of cases where the interests of justice most clearly require it.' " *Id.* at 548 (quoting *Youngblood*, 488 U.S. at 58).

¶ 37   Defendant cites Justice Stevens's succinct concurrence in *Fisher* as support for his contention that a showing of bad faith is not required under state law. Defendant asserts that although his federal due process rights were not violated, it is possible, even in light of *Fisher*, that his state due process rights were violated because in his concurrence, Justice Stevens specifically stated, "The judgment of the Illinois Appellate Court has limited precedential value, and may well be reinstated on remand because the result is supported by the state-law holding in *People v. Newberry*, [166 Ill. 2d 310 (1995)]." *Id.* at 550 (Stevens, J., concurring).

¶ 38   A review of cases decided subsequent to *Fisher* is pertinent to resolving this conflict.

"With respect to the due-process clause of the fourteenth amendment [citation], *Fisher* supersedes *Newberry* because the Supreme Court of the United States is 'the final arbiter on issues involving questions of the [f]ederal constitution' [citation]. But the Illinois Constitution also has a due-process clause [citation]. State courts are free to interpret their own constitutional provisions more broadly than the Supreme Court of the United States interprets similar federal constitutional provisions." *People v. Kizer*, 365 Ill. App. 3d 949, 960 (2006).

¶ 39   In *Kizer*, the court stated that it was faced with "the following question: Would our own supreme court accept the analysis in *Fisher* when interpreting the due-process clause of the Illinois Constitution?" *Id.* The court "predicted" that the answer to this question would be yes for four reasons. *Id.* Those four reasons are (1) "when discussing the concept of due process in *Newberry*, the supreme court made no distinction between the due-process clause of the Illinois Constitution and that of the federal constitution"; (2) in *People v. Pecoraro*, 175 Ill. 2d 294, 318 (1997), our supreme court declined to interpret the Illinois due process clause more broadly than the Supreme Court interpreted the federal due process clause; (3) "*Fisher* purported merely to interpret or clarify *Youngblood*, a decision that our own supreme court has repeatedly followed when assessing due process"; and (4) "in *People v. Caballes*, 221 Ill. 2d 282, 313 (2006), the supreme court recently reaffirmed its commitment to the 'limited lockstep analysis.' " [2] *Kizer*, 365 Ill. App. 3d at 960-61.

¶ 40   The *Kizer* court pointed out that our state constitution's due process clause has nearly identical language to the federal constitution. *Id.* at 961. The court concluded that the Illinois due process clause had the same meaning as its federal counterpart, and thus, it concluded that our supreme court would follow *Fisher* when analyzing our state constitution's due process clause. *Id.*

¶ 41   Similarly, in *People v. Voltaire*, 406 Ill. App. 3d 179, 183 (2010), the court stated, "[w]e agree with *Kizer* that, if confronted with the issue, the supreme court would follow *Fisher*."

---

[2]For purposes of context, "[u]nder our limited lockstep doctrine, we construe [a] *** clause of our state constitution the same way [as the Supreme Court interprets the similar federal clause], unless any of the narrow exceptions to lockstep interpretation apply." *People v. Fitzpatrick*, 2013 IL 113449, ¶ 28.

The court opined, "*Newberry* appears to be nothing more than an application of [*California v. Trombetta*, 467 U.S. 479 (1984),] and *Youngblood*, and the Supreme Court has now clarified that the application of those cases to this situation contradicts the holding in *Newberry*." *Id.*

¶ 42    Further, this court, in *People v. Moore*, 2016 IL (1st) 133814, ¶ 28, observed that "[a]lthough we do not have further guidance from our supreme court, subsequent to *Fisher*, the appellate court has rejected *Newberry* and followed *Fisher*." The *Moore* court specifically stated that it too found the reasoning in *Kizer* and *Voltaire* "persuasive" and opted to analyze the facts before it under the analysis set forth in *Fisher*. *Id.* ¶ 31.

¶ 43    Here, we see no reason to depart from the aforementioned decisions of this court and the other appellate districts. Defendant does not point to, and we have not found, any cases that deviate from this trend. We find the *Kizer* court's logic, namely, the four reasons that led it to predict that our supreme court likely would not continue to follow *Newberry* in light of *Fisher*, to be rational and convincing. See *Kizer*, 365 Ill. App. 3d at 960-61. As a result, we apply the analysis as set forth in *Youngblood* and *Fisher*, which means unless defendant can show bad faith on the part of the police, the failure of the police to preserve potentially useful evidence will not constitute a denial of due process of law. See *Youngblood*, 488 U.S. at 58.

¶ 44    Having already determined that the evidence at issue here was merely "potentially useful," we next address whether the police acted in bad faith. Defendant argues that the police here acted in bad faith where they failed to follow proper procedure that resulted in the destruction of otherwise unavailable evidence. The State responds that defendant has failed to offer anything but mere speculation regarding bad faith conduct by the police. The State specifically argues that defendant's claim that the police acted in bad faith due to their failure to follow proper procedure is solely based on Officer Caribou's mistaken testimony that he put a hold on the Bulls jacket.

¶ 45    Defendant primarily relies on *People v. Walker*, 257 Ill. App. 3d 332 (1993), to support his contentions that the officers here acted in bad faith. In *Walker*, the sole issue the court addressed was whether the trial court erred in dismissing the defendant's indictment on the basis that the defendant's due process rights were violated when the police destroyed material evidence. *Id.* at 333. At trial, the victim testified that on the night in question, she was waiting to pick up her order in a pizza restaurant when the defendant took her wallet and attempted to take money that she had in her hand. *Id.* She recalled during her testimony that at that time, the defendant was wearing "a brown leather cap, a light-colored jacket and blue jeans." *Id.* After the police arrested the defendant, he was brought back to the crime scene where he was identified by the victim. *Id.* The victim testified that when the defendant exited the police car, he was wearing different clothes than when she saw him at the pizza restaurant and that he had mud on him, but that his face looked the same. *Id.* After the victim's testimony, the State informed the court and the defense that some inventoried evidence had been destroyed six weeks after the arrest and eight months prior to trial, "including a plastic bag, a jacket, a hat, a knife, a grey suit and a pair of brown leather gloves." *Id.* at 333-34.

¶ 46    On appeal, the State argued that the defendant's motion to dismiss the indictment should not have been granted because there was no showing of bad faith on the part of the police. *Id.* at 335. The court rejected the State's argument that the bag and clothing were destroyed in accordance with proper police procedure and, therefore, in good faith. *Id.* The court found that the police had acted in bad faith where the evidence was destroyed six weeks after the defendant's arrest because "a reasonably prudent police officer acting in good faith would not

assume that material evidence would no longer be needed six weeks after the arrest." *Id.* at 335-36.

¶ 47    The facts underlying the case before us are markedly different than what occurred in *Walker*. Here, there is no evidence of when the jacket and ID were destroyed. Additionally, the inventory sheet reflects that the Bulls jacket was marked as "property available for return to owner," which signifies that a hold was not placed on the jacket, contrary to Officer Caribou's testimony. As the trial court mentioned, it is possible that the police attempted to contact defendant to return the items to him given the demarcation on the inventory sheet but that he was unable to be reached because he was incarcerated. Also, because there is no evidence of when the jacket was destroyed, we are unaware if there was, in fact, time for defendant to examine the jacket. Thus, we cannot say that the destruction of the jacket was not in accordance with normal police procedures. In *Walker*, that the evidence was destroyed six weeks after the defendant's arrest rendered the police's actions in bad faith. Here, there is no evidence that the police acted in bad faith to destroy the jacket. Although Officer Caribou testified that he was "positive" he had put a hold on the jacket, the inventory sheet shows that, in fact, a hold was not placed on the jacket. We do not find that this testimony by Officer Caribou evidences any bad faith on the part of the police. Further, as stated before, the Bulls jacket and the ID were nearly irrelevant in this case given the circumstances surrounding the officers' identification of defendant.

¶ 48    Defendant asserts that it is very likely that the ID in the pocket was not defendant's because defendant had his own ID, which Officer Mostowski used to take his information at the station. We find this contention to be based on pure speculation. In fact, a close review of Officer Meadows's testimony shows that it is unclear whether an ID was even in the pocket of the Bulls jacket. Officer Meadows testified that his partner went through the jacket. He further stated that he saw an ID, but was "not sure" if it had come from the pocket of the jacket. Thus, there is no evidence that actually establishes that an ID was removed from the Bulls jacket and consequently destroyed therewith. Defendant argues that the failure to inventory the ID was a deviation from proper procedure, evidencing bad faith. However, Officer Mostowski testified that he would not have placed a hold on the ID but would have given it back to defendant to take with him to lockup. As a result, we find no evidence of bad faith on the part of the police here. Because defendant could not show bad faith by the police in the destruction of potentially useful evidence, his claim that he was deprived of his due process rights fails under the *Youngblood* and *Fisher* analyses.

¶ 49                                    Discovery Violation

¶ 50    Having determined that defendant's due process rights were not violated under either the federal or state constitutions,[3] we next address defendant's alternative contention that even if the police did not act in bad faith when they destroyed the Bulls jacket, the court improperly

---

[3]In this section, defendant again asserts that he has a viable state-law due process claim under *Newberry* in the context of an Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001) discovery violation. However, we have already rejected defendant's invitation to reinstate the *Newberry* holding subsequent to *Fisher*. As such, defendant's state-law based due process challenge fails here for the same reasons set forth previously in this order.

denied his motion to dismiss based on the State's destruction of the evidence, which is a discovery violation.

¶ 51   As an initial matter, we note the parties disagree as to the applicable standard of review. Citing *People v. Lovejoy*, 235 Ill. 2d 97, 118 (2009), defendant argues that because the facts that gave rise to the discovery violation are not in dispute here, we should conduct a *de novo* review. The State asserts that an abuse of discretion standard of review applies because the *de novo* standard used in *Lovejoy* was only pertinent to a reviewing court's determination as to whether a discovery violation occurred and that an abuse of discretion standard governs whether the trial court's decision regarding whether to impose a sanction was proper. We agree with the State. The threshold issue is not whether the court below ordered an appropriate discovery sanction, but instead is whether the State was, in fact, guilty of a discovery violation. *People v. Hood*, 213 Ill. 2d 244, 256 (2004). When a reviewing court addresses that threshold inquiry and the parties do not dispute the facts giving rise to the alleged discovery violation, then *de novo* review applies because a purely legal question is involved. *Lovejoy*, 235 Ill. 2d at 118. Once that determination is made, then the question becomes whether the trial court made the correct decision as to the appropriate discovery sanction, which is subject to an abuse of discretion standard. *Hood*, 213 Ill. 2d at 256. As a result, we review *de novo* whether a violation occurred, and we review the trial court's decision to deny the motion to dismiss for an abuse of discretion.

¶ 52   In relevant part, Rule 412 states:

"(a) Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

* * *

(g) Upon defense counsel's request and designation of material or information which would be discoverable if in the possession or control of the State, and which is in the possession or control of other governmental personnel, the State shall use diligent good-faith efforts to cause such material to be made available to defense counsel; and if the State's efforts are unsuccessful and such material or other governmental personnel are subject to the jurisdiction of the court, the court shall issue suitable subpoenas or orders to cause such material to be made available to defense counsel." Ill. S. Ct. R. 412(a), (g) (eff. Mar. 1, 2001).

¶ 53   Rule 415(g)(i) provides:

"If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances." Ill. S. Ct. R. 415(g)(i) (eff. Oct. 1, 1971).

¶ 54   "[T]o establish a discovery violation under Illinois Supreme Court Rule 415(g)(i) it is only required to show that 'a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto.' " *People v. Kladis*, 403 Ill. App. 3d 99, 105 (2010) (quoting Ill. S. Ct. R. 415(g)(i) (eff. Oct. 1, 1971)).

¶ 55    As noted above, we must first determine whether a discovery violation occurred here. We find that the evidence before us does not clearly indicate whether a discovery violation did or did not occur. Defendant filed his motion for discovery on July 10, 2014, which was approximately three months after defendant's arrest. The parties stipulated that the Bulls jacket inventoried in this matter was destroyed, and that the parties had "no idea of the circumstances surrounding the destruction." Thus, it is impossible to know whether the jacket was destroyed prior to, or subsequent to, the filing of defendant's motion for discovery. Although Officer Caribou testified that he was "positive" he had placed a hold on the jacket, the inventory sheet was marked as "property available for return to owner." Notwithstanding the foregoing, we presume *arguendo* that a discovery violation occurred here and turn next to whether the denial of the motion to dismiss was an abuse of discretion.

¶ 56    Defendant relies on *People v. Koutsakis*, 255 Ill. App. 3d 306 (1993), wherein the court affirmed the trial court's sanction of the State for destruction of evidence. In *Koutsakis*, the State could not produce the tape recording related to the stop and search of the defendant's vehicle, and the trial court determined that the proper sanction was to limit the testimony of the police officers involved. *Id.* at 314. In reaching its decision to enter this sanction, the trial court noted that State police logs were not a sufficient substitute for the tape since the logs did not contain information regarding the officer's activities during the stop and search. *Id.* On appeal, the court found no abuse of discretion and concluded "the trial court properly fashioned an appropriate sanction which was limited and proportionate to the discovery violation." *Id.*

¶ 57    We find that the trial court did not abuse its discretion when it denied defendant's motion to dismiss based on destruction of evidence. "[A] trial court may properly fashion a sanction for a discovery violation when it is proportionate to the magnitude of the violation. [Citation.] The trial court is in the best position to determine an appropriate sanction based upon the effect the discovery violation will have upon the defendant." *Id.* Here, the only sanction sought by defendant was dismissal of the charges. The original iteration of his motion to dismiss included a request for the exclusion of any testimony regarding the jacket. However, defense counsel sought and was granted leave to amend the motion to omit from the prayer for relief the request to strike testimony. Thus, the trial court was faced with determining whether the dismissal of the charges here would be proportional to the conduct that led to the destruction of evidence, and ultimately determined it would not be. We agree because the destruction was inadvertent and there was conflicting evidence of whether a hold was ever placed on the jacket in the first place.

¶ 58    In *Koutsakis*, there was no adequate substitute for the destroyed evidence. *Id.* However, in this case, a substitute for the destroyed evidence was not relevant because the officers' identification of defendant was not based on the jacket but instead was based on defendant's appearance and his "unique" Mohawk hairstyle. Additionally, in *Koutsakis*, it was clear that the defendant requested the tape "*before* the State destroyed it." (Emphasis in original.) *Id.* at 312. Here, it is possible that the jacket was destroyed before defendant filed his motion for discovery. However, even if defendant's motion was filed prior to destruction, we would still not find that the trial court's decision was an abuse of discretion. By withdrawing part of his prayer for relief in his motion to dismiss, defendant unambiguously indicated to the court that he only sought the sanction of dismissal. Pursuant to Rule 415, the trial court could arguably have imposed any "other order as it deems just under the circumstances" but opted not to. Ill. S. Ct. R. 415(g)(i) (eff. Oct. 1, 1971). We find that in light of defendant's withdrawal of his

specific request to exclude testimony regarding the jacket, the trial court's decision to merely deny the motion to dismiss, and not impose any other sanctions, was not an abuse of discretion. Dismissal of the charges against defendant would have been a disproportionate sanction. In light of the foregoing, we find no indication that the denial of defendant's motion was an abuse of discretion and similarly deny defendant's request that we impose a sanction less severe than dismissal.

¶ 59                                    CONCLUSION

¶ 60      Based on the foregoing, we find the trial court properly denied defendant's motion to dismiss and affirm its decision.

¶ 61      Affirmed.