2020 IL App (1st) 172503-U

No. 1-17-2503

Order filed March 31, 2020.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2015 CR 866801 |
| | ) | |
| JAMES DEMUS, | ) | The Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

ORDER

¶ 1    *Held*: Defendant's aggravated kidnaping conviction was reduced to kidnaping where the hammer used in the offense did not satisfy the statutory definition of a dangerous weapon. Additionally, the State did not violate discovery rules or due process by failing to preserve the victims' photographs.

¶ 2    Following a bench trial, defendant James Demus was convicted of aggravated kidnaping

and domestic battery. On appeal, defendant asserts that the State failed to prove he was armed

with a dangerous weapon under section 33A-1 of the Criminal Code of 2012 (Code) (720 ILCS

5/33A-1 (West 2014)), as required to sustain his conviction for aggravated kidnaping. Defendant also asserts the State failed to preserve photographs the victim took of herself after the incident. For the following reasons, we reduce defendant's aggravated kidnaping conviction to simple kidnaping and remand for resentencing. We affirm the judgment in all other respects.

¶ 3                                          I. Background

¶ 4     Defendant was charged with the aggravated kidnaping of Alexis Reese while "armed with a dangerous weapon, other than a firearm, to wit: a hammer." He was also charged with aggravated unlawful restraint and domestic battery by inflicting bodily harm.

¶ 5     At trial, Reese, then 26 years old, testified that in April 2015, she lived with her aunt at 9145 South Woodlawn. She was dating defendant and had discussed with him that she was pregnant with his child. Reese drove a white, two-door Grand Prix, which was registered in her name, but defendant regularly drove the car and had given her money for the title.

¶ 6     At about 5 p.m. on April 19, 2015, defendant drove Reese, in the Grand Prix, to the Citibank at 87th and Stony Island so she could deposit money. They argued on the way there because defendant believed Reese was having sexual relations with someone who gave her the money. As Reese stood outside the car by the drive-through ATM, she was an arm's length from defendant. He reached through his car window and pulled her toward the car three times, causing her to hit her head on the doorframe. As a result, she had a swollen black eye. Despite this, Reese did not try to run away because her attempts to run away from defendant on numerous prior occasions were unsuccessful. Instead, she complied with defendant's order to get in the car. He told her it would only get worse if she did not. At some point, he also slapped and punched her in the head, and pulled out some of her hair. Reese identified video footage from the bank's security camera.

¶ 7      Back in the car, defendant drove around for 10 to 15 minutes while hitting Reese "everywhere" with his hands. Near 91st and Woodlawn, he stopped the car, accused her of lying and took her phone. Additionally, defendant said he had something for her and got out of the car, threatening to hurt her if she got out too. Reese decided to get out of the car once defendant opened the trunk. When she proceeded to open the door, however, defendant returned with a hammer that he used for work. He kept several work tools in the car.

¶ 8      Defendant ordered Reese to put her hands on the armrest between the seats. When she complied, he tried to hit her hands with the hammer, but she moved them out of the way. She then complied with his order to put her hands on the dashboard. He again attempted to swing the hammer at her hands, but she moved them once more. Additionally, she dodged the hammer as he swung it toward her head. Subsequently, he moved the car to the opposite side of the street and warned her against attracting attention. When other people came outside, defendant drove away.

¶ 9      Over the course of the night, the couple experienced car trouble. Defendant lifted the hood to try to fix the problem while Reese, at defendant's direction, sat in the driver's seat and tried to start the car. Once the car started, defendant ordered Reese to get in the backseat. At some point, defendant got Reese food from a Wendy's drive through and purchased marijuana without getting out of the car. He later told her to use her phone to locate a restaurant, but the restaurant was closed. Defendant then instructed Reese to give him back her phone. Furthermore, Reese testified that she vomited throughout the evening. In the backseat, she stuck her head out the window to vomit. In the front seat, she opened the car door to do so. She was allowed to go to the bathroom in the alley on one occasion. Defendant, however, repeatedly denied Reese's

requests to go home and the hammer was always within his reach, even when he put in in the backseat for a short period.

¶ 10    After three or four hours in the car, defendant had Reese call her three-year-old son's father to say she would not be picking up her son until the next day. Reese used her own phone but was required to return it to defendant after the call. After six hours of being in the car, defendant parked the car in an alley, where they had smoked marijuana and watched movies on several occasions. Defendant asked Reese why she thought it was acceptable to run away from him for a week. Reese testified that in the time leading up to this incident, she had avoided defendant. Defendant then said she would only leave this relationship if she "was six feet under." At some point, defendant directed her to the front seat and proceeded to hit and punch her in the head and arm. He also called contacts in her phone, trying to get her to sell her body. After additional car trouble, defendant started hitting Reese again. This time she kicked back but he only hit her more. Despite their ongoing conflict, they watched a movie and defendant slept from about 2 a.m. until 5 a.m., laying across the front seat with his hammer at his side. Reese, who was in the backseat, never slept.

¶ 11    Defendant and Reese picked up Marcus, defendant's nephew and coworker, at about 7 a.m. Marcus sat in the front passenger seat. Subsequently, defendant drove to Auto Zone and went inside for 5 or 10 minutes. Reese testified that she did not tell Marcus what happened because she did not think he would help her. Specifically, Marcus had seen defendant abuse her before but did not do anything about it. Reese acknowledged testifying at the preliminary hearing that she was comfortable with Marcus. When defendant was finished at Auto Zone, he and Marcus left Reese in the car for a few minutes while they went inside their workplace. Reese did not try to escape, however, because she was afraid of what defendant would do.

¶ 12    Defendant finally took Reese home at about 11 a.m. He returned her phone but kept the car. At home, Reese called her father, Owen Pittman, and then called the police. She was instructed to go the police station but had no way to get there so she waited for Pittman. Eventually, when it was dark out, Pittman called to inform her that defendant was outside her home. Defendant had parked directly across the street. Reese called the police, but defendant drove away when they arrived. After making a report, Reese stayed at her mother's home for months. She got her car back and obtained a restraining order against defendant. Although Reese never sought medical attention, she took photographs of her eye on the day after the incident. She showed them to Detective Scarriot, but he said they were not acceptable for the case because he could not see any bruising.

¶ 13    Reese also showed Detective Scarriot text messages she received from defendant. In one message, defendant said, "I see and hear everything, so in due time I will see you." Above that message was a photograph of Reese and her family members at her grandmother's grave site. He later said, "You dumb bitch. You gonna get what you looking for, 6 feet deep." In another message, defendant said, "My people finna go to your mom['s] house right now. I want my shit, hoe." Reese responded, "I'm good," to indicate that he should leave her alone. In reply, defendant said, "Do you, but it's not going to be that easy when by blood get that, getting hot, I'm gonna just come and - - I don't know snap." He further stated, "Shorty, you not finna just do what you wanna do and that's it. I will see you cause 9145 S. Woodlawn is not that hard to come find or come in."

¶ 14    Defendant also sent the following text message, however:

"Alexis, I am sorry for everything that happened between us. I should have never put my hands on you. I am really sorry and I want to make it up to you by being your best

friend, baby daddy. G, give me one last chance. I promise I am not going to fuck it up. I love you so much. I want to make sure you safe, talk."

Reese did not respond. When she answered his call on one occasion, defendant said, "I want my shit. If I don't get my shit, you are going to be 6 feet under."

¶ 15    Pittman, who was convicted of felony wire fraud in 2008, testified that he spoke to Reese at about 11 a.m. on April 20, 2015. She was shaken and crying. In a second phone conversation shortly thereafter, he told her to stay at home until he could pick her up to take her to the police station. At about 8:30 or 9 p.m., Pittman told Reese he was on the way to pick her up. When he arrived, however, he saw defendant sitting in her car on the opposite side of the street from the house. Pittman parked a couple of cars behind defendant. He then called Reese and told her to call the police. When the police arrived about 10 minutes later, defendant sped away, but the police did not chase him. Pittman testified that Reese had some abrasions around her eye. Her eye was dark, somewhat black, purple and red. She was bruised and seemed to have been struck. While her face was not overly swollen, or black and blue, she was missing hair.

¶ 16    Following closing arguments, the court found defendant guilty of all three counts, stating, "I saw the video. I saw quite clearly that there was this physical act of violence by [defendant] towards Ms. Reese. He pulled her into the car. She hit her - - her body hit her car at least twice." The court found Reese to be "entirely credible about the account that occurred at the bank and her testimony was corroborated by the bank video. *** There [were] three different camera shots that essentially all told the same thing."  The court also stated it believed Reese's account of what happened that night and found that the hammer was a dangerous weapon, elevating kidnaping to aggravated kidnaping. The court subsequently found the aggravated unlawful

restraint count merged into aggravated kidnaping and imposed concurrent sentences of six years' imprisonment for aggravated kidnaping and three years' imprisonment for domestic battery.

¶ 17                                             II. Analysis

¶ 18                                          A. Dangerous Weapon

¶ 19    On appeal, defendant first asserts that the state failed to prove he committed aggravated

kidnaping. Specifically, he argues that while the State's theory was that he committed kidnaping while armed with a dangerous weapon, a hammer does not constitute a dangerous weapon under the aggravated kidnaping statute.

¶ 20    When reviewing the sufficiency of the evidence, courts consider whether, in viewing the

evidence in the light most favorable to the prosecution, any reasonable trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Eubanks*, 2019 IL 123525, ¶ 95. Yet, the issue here is whether an ordinary hammer can ever constitute a dangerous weapon under the aggravated kidnaping statute, presenting a matter of statutory construction that we review *de novo*. *People v. Heritsch*, 2012 IL App (2d) 090719, ¶ 7.

¶ 21    In construing a statute, our primary objective is to effectuate the legislature's intent,

which is best shown by the statute's language. *Id*. We must read the statute as a whole. *People v. Hunt*, 234 Ill. 2d 49, 59 (2009). Conversely, no word or phrase should be considered in isolation. *People v. Villa*, 2011 IL 110777, ¶ 35.

¶ 22    Section 10-2 of the Code defines aggravated kidnaping:

        "(a) A person commits the offense of aggravated kidnaping when he or she

    commits kidnapping and:

                                             ***

> (5) commits the offense of kidnaping while armed with a dangerous weapon, other than a firearm, as defined in Section 33A-1 of this Code[.]" 720 ILCS 5/10-2(a)(5) (West 2014).[1]

According to the State, a hammer constitutes a Category III weapon under the residual clause of section 33A-1(c)(3).

¶ 23      Section 33A-1(c)(3) states that "[a] Category III weapon is a bludgeon, black-jack, slungshot, sand-bag, sand-club, metal knuckles, billy, *or other dangerous weapon of like character.*" (Emphasis added.) 720 ILCS 5/33A-1(c)(3) (West 2014). Under the doctrine of *ejusdem generis*, where a statutory clause specifies several classes of things as well as "other" things, "other" means "other such like." *People v. Davis*, 199 Ill. 2d 130, 138 (2002). Thus, a hammer qualifies as a dangerous weapon under section 33A-1(c)(3) only if it is like the other items enumerated in the statute. We find that a hammer is not a Category III weapon under the statute pursuant to the reasoning in *People v. Hernandez*, 2016 IL 118672.

¶ 24      In *Hernandez*, the defendant was convicted of armed robbery while armed with a bludgeon. *Id.* ¶¶ 3-7. He subsequently asserted that the armed robbery statute was facially unconstitutional because it carried a harsher penalty than that imposed for armed violence with a category III weapon. *Id.* ¶ 1 This contention required the court to compare the elements of the offenses. *Id.* ¶ 9.

¶ 25      The armed violence statute (720 ILCS 5/33A-2 (West 1998)), like the aggravated kidnaping statute at issue before us, required that the defendant be "armed with a dangerous weapon" as defined by section 33A-1. *Hernandez*, 2016 IL 118672, ¶¶ 13, 16. The armed robbery statute (720 ILCS 5/18-2 (West 1998)), however, did not define "dangerous weapon"

---

[1] We note that the legislature has referred to both "kidnaping" and "kidnapping" in this statute.

and, thus, the common law definition of that term applied. *Hernandez*, 2016 IL 118672, ¶¶ 12, 16. Because the two offenses had different definitions for a dangerous weapon, they did not share the same elements and could not result in a proportionate penalties violation. *Id*. ¶ 16.

¶ 26    Under the common law, determining what constitutes a dangerous weapon presents a factual question. *Id*. ¶ 12. The common law definition includes any object sufficiently subject to be used in a manner likely to cause a victim serious injury, *i.e.*, objects that are *per se* dangerous, as well as objects that *may* be used in a dangerous manner. *Id*.; see also *People v. Ross*, 229 Ill. 2d 255, 276 (2008) (stating in the context of armed robbery that "the trier of fact may make an inference of dangerousness based upon the evidence"); *People v. Westefer*, 169 Ill. App. 3d 59, 61 (1988) (stating in the context of armed robbery that the trier of fact decides "whether the particular object was sufficiently susceptible to use in a manner likely to cause serious injury to qualify as a dangerous weapon"); *People v. Brown*, 87 Ill. App. 3d 368, 370-71 (1980) (similar).

¶ 27    Because the armed violence statute adopted the statutory definition, however, the broader common law definition did not apply to that offense. *Hernandez*, 2016 IL 118672, ¶¶ 13, 16. Our supreme court stated, "Category III dangerous weapons for purposes of the armed violence statute are defined by the statute and are therefore limited to the weapons identified by the statute." *Id*. ¶ 13; but see *People v. Weger*, 154 Ill. App. 3d 706, 713 (1987) (quoting *City of Pekin v. Shindledecker*, 99 Ill. App. 3d 571 (1981)) (finding before *Hernandez* that the armed violence statute called for a common-sense approach, acknowledging "the character of the device and its potential for harm, while not being oblivious to the article's everyday use"); *cf. People v. Ptak*, 193 Ill. App. 3d 782, 784-85  (1992) (stating in the context of armed violence that objects listed in section 33A-1 were *per se* dangerous weapons, but objects not listed could qualify if of like character and if used in a manner dangerous to a person's well-being).

¶ 28    Turing to the facts before it, *Hernandez* found that the tin snips used in the offense were not a bludgeon "or other dangerous weapon of like character" under the statute, notwithstanding that tin snips would qualify as a dangerous weapon under the common law definition that applied to armed robbery. (Internal quotation marks omitted.) *Hernandez*, 2016 IL 118672, ¶¶ 14-15 (quoting 720 ILCS 5/33A-1(c) (West 1998)). Additionally, it made no difference that the defendant struck the victims in the head with the tin snips. *Hernandez*, 2016 IL 118672, ¶ 4; see also *People v. Ligon*, 2016 IL 118023, ¶ 27 (stating that "an object, regardless of how it is used, cannot be considered a dangerous weapon for purposes of the armed violence statute unless it is included in the three categories of weapons set forth in that statute").

¶ 29    Following our supreme court's reasoning, we find that a hammer is not a Category III weapon as defined by section 33A-1(c)(3), and as required to satisfy the aggravated kidnaping statute. Each of the items enumerated in that statute is intended to be exclusively used as a weapon. See *People v. Vue*, 353 Ill. App. 3d 774, 780 (2004) (finding that the legislature intended for inherently dangerous weapons to constitute dangerous Category III weapons). As the State acknowledges, a bludgeon is defined as "[a] thick stick with a heavy end, *used as a weapon*." (Emphasis added.) English Oxford Living Dictionaries, https://en.ofxforddictionaries.com/definition/bludgeon (last visited January 21, 2020); see also *People v. Dominguez*, 2012 IL 111336, ¶ 18 (stating that courts may look to the dictionary to ascertain a term's plain, ordinary and popularly understood meaning).

¶ 30    In contrast, a hammer is defined as "[a] tool with a heavy metal head mounted at right angles at the end of a handle, used for jobs such as breaking things and driving in nails." English Oxford Living Dictionaries, https://en.ofxforddictionaries.com/definition/hammer (last visited January 21, 2020). Thus, while a bludgeon is designed to be used as a weapon, a hammer is

designed to be used as a tool. Indeed, evidence indicated that defendant kept his hammer and several other tools in the car for work. While the State argues that a hammer's primary purpose is to magnify force, a hammer is not intended to magnify force against human beings. See also *People v. Westmoreland*, 2013 IL App (2d) 120082, ¶ 23 (finding that a belt is not a Category III weapon); *People v. Vue*, 353 Ill. App. 3d 774, 781 (2004) (finding that a flashlight is not a Category III dangerous weapon). Thus, a hammer is not a "dangerous weapon of like character" and does not fall within 33A-1(c)'s residual clause.

¶ 31    The State further argues "[i]t is clear that the manner in which defendant used the hammer was dangerous." We agree, and yet, defendant was not "armed with a dangerous weapon, other than a firearm," as defined by section 33A-1 and section 10-2(a)(5). See *Ligon*, 2016 IL 118023, ¶¶ 23-24 (finding that a BB gun cannot be considered a bludgeon or other dangerous weapon of like character under section 33A-1(c) given that a BB gun is not typically identified as a bludgeon, notwithstanding that it was capable of being used as a bludgeon and that it would constitute a dangerous weapon under the common law definition); *Davis*, 199 Ill. 2d at 141 (finding that "although a metal pellet/BB pistol might be capable of being used as a bludgeon, it is not typically identified as such and, under the doctrine of *ejusdem generis*, cannot be interpreted to be 'of like character' to the bludgeon-type weapons included in the category"); *Vue*, 353 Ill. App. 3d at 781 (stating that section 33A-1(c) does not provide that an item constitutes a bludgeon if it shares physical characteristics with a bludgeon or is used like a bludgeon to harm the victim). The State's reliance on caselaw applying other definitions of a dangerous weapon is misplaced. See, *e.g.*, *People v. Charles*, 217 Ill. App. 3d 509 (1991).

¶ 32    Because the evidence did not show that defendant was armed with a dangerous weapon, as required to be convicted of aggravated kidnaping, we reduce his conviction to simple kidnaping and remand for resentencing.

¶ 33                              B. Photographs of the Victim

¶ 34    Next, defendant asserts that the State violated due process and rules of discovery by failing to preserve the photographs that the victim showed to the police.  Defendant asserts that this violation should have resulted in the dismissal of charges or the exclusion of testimony. We must begin by considering defendant's non-constitutional assertion under the rules of discovery. See *People v. Kelly*, 2012 IL App (1st) 101521, ¶ 27.

¶ 35    As a threshold matter, defendant acknowledges that he failed to challenge the unpreserved photographs at trial. He nonetheless urges us to review this as plain error, or alternatively, find that trial counsel was ineffective for failing to raise this issue below. Plain error first requires a court to determine whether an error occurred. *People v. Sanders*, 2012 IL App (1st) 102040, ¶ 24. Additionally, counsel is not ineffective for failing to preserve an error where there was no error worth objecting to. *Id*. Here, we find no error.

¶ 36                              1. Rules of Discovery

¶ 37    We generally review *de novo* whether a discovery violation occurred, but we review the trial court's decision in imposing an appropriate sanction, or declining to do so, for an abuse of discretion. See *People v. Cunningham*, 2018 IL App (1st) 153367, ¶ 51.

¶ 38    Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001) governs the disclosure of materials within the possession of the State. *People v. Koutsakis*, 255 Ill. App. 3d 306, 310 (1993). Rule 412(f) states as follows:

"The State should ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged." Ill. S. Ct. R. 412(f) (eff. Mar. 1, 2001); *People v. Carbadillido*, 2011 IL App (2d) 090340, ¶ 50 (characterizing Rule 412(f) as imposing an affirmative obligation on the State).

Rule 415(g)(i) further states:

"If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court *may* order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, *or enter such other order as it deems just under the circumstances*." (Emphases added.) Ill. S. Ct. R. 415(g)(i) (eff. Oct. 1, 1971).

Rule 415 requires only that a party demonstrate that an opposing party failed to comply with an applicable discovery rule. *Cunningham*, 2018 IL App (1st) 153367, ¶ 54. Additionally, courts can impose Rule 415 sanctions for inadvertent discovery violations, with no showing of bad faith. *Koutsakis*, 255 Ill. App. 3d at 312. An array of appropriate sanctions is available under the rule. *Id.*

¶ 39    Here, defendant filed a general discovery motion. He requested "[a]ny and all material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefore." Yet, defendant did not specifically request photographs of the victim. See *Koutsakis*, 255 Ill. App. 3d at 311 (stating that a defendant who requests specific evidence is not required to show the evidence's exculpatory value because the State is on notice to preserve such evidence). Additionally, neither

the State nor investigative personnel ever possessed them. Thus, the record does not support defendant's assertion that the State permitted investigative personnel to lose or destroy the photographs, nor does it show that the State, or the police, should have attempted to possess them.

¶ 40    As stated, Rule 412 renders the State responsible for "material and information relevant to the accused and the offense charged." Reese testified that she took the photographs herself and showed them to Detective Scarriot, but he did not accept them because they did not depict any bruises. Defendant takes this one step further by speculating that this means Reese had no bruises. It is equally possible, however, that the photographs did not show any bruises because Reese was a poor photographer or because lighting conditions were poor. A photograph that fails to accurately capture the victim's physical state would not be relevant.

¶ 41    Even assuming a discovery violation occurred, the trial court was not required to impose sanctions because the violation resulted in no prejudice. See *People v. Hendricks*, 325 Ill. App. 3d 1097, 1102 (2001) (stating that "a reviewing court will find an abuse of discretion when a defendant is prejudiced by the discovery violation and the trial court fails to eliminate the prejudice"). Defendant contends that he was prejudiced because evidence of bodily harm, which is  necessary to convicted him of domestic battery (720 ILCS 5/12-3.2(a) (West 2014)), was not overwhelming here. Defendant ignores, however, that Pittman corroborated her testimony that she sustained bodily harm. Specifically, Pittman testified that she was at least somewhat bruised and was missing hair.

¶ 42    More importantly, defendant ignores that the State presented surveillance footage showing defendant using force against Reese at the bank. Indeed, the trial court found as follows:

"I saw the video. I saw quite clearly that there was this physical act of violence by [defendant] towards Ms. Reese. He pulled her into the car. She hit her - - her body hit her car at least twice."

Having reviewed the surveillance footage, we find it amply supports the trial court's finding of bodily harm, regardless of whether Reese sustained bruising. Photographs depicting an absence of bruises would not have altered this determination. Accordingly, the trial court was not required to impose sanctions.

¶ 43                                    2. Due Process

¶ 44     We similarly reject defendant's assertion that the State violated due process by denying him access to the photographs of Reese's injuries. Under the due process clause of the fourteenth amendment, "[a] defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed." *California v. Trombetta*, 467 U.S. 479, 485 (1984). Absent a specific request, the prosecution is constitutionally required to turn over exculpatory evidence that would create a reasonable doubt regarding the defendant's guilt. *Id.* When the State fails to disclose material exculpatory evidence, the good or bad faith of the State in doing so is irrelevant to determining whether a due process violation occurred. *Illinois v. Fisher*, 540 U.S. 544, 547 (2004). A distinction exists, however, between evidence that is materially exculpatory and evidence that is only potentially useful. *Id.* at 549.

¶ 45     When the State fails to preserve only potentially useful evidence, no violation of due process has occurred unless the defendant can demonstrate bad faith by the police. *Id.* at 548; *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). The Court has been unwilling to find that the due process clause's fundamental fairness requirement imposes "on the police an

- 15 -

undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id*. Additionally, for purposes of the federal due process clause, the existence of a pending discovery request does not eliminate the obligation to show the police acted in bad faith. *Fisher*, 540 U.S. at 548; see also *People v. Cunningham* , 2018 IL App (1st) 153367, ¶ 43 (agreeing with several appellate court cases applying *Fisher's* analysis when considering Illinois' due process clause); but see *People v. Bolden*, 2014 IL App (1st) 123527, ¶¶ 39-41, 55 (finding that trial counsel was ineffective for failing to move for sanctions for the destruction of requested firearms evidence before case law had unequivocally required a showing of bad faith).

¶ 46    Here, Reese's photographs were potentially useful at best, not materially exculpatory. Even were we to join in defendant's speculations, the photographs would show only that the bodily harm sustained by Reese did not cause bruising. The photographs would not negate other evidence that she sustained bodily harm. Moreover, defendant has provided no evidence that the State acted in bad faith. See *People v. Sutherland*, 223 Ill. 2d 187, 237 (2006) (finding the "defendant failed to offer anything, other than mere speculation, demonstrating bad faith by the State"). We find no error.

¶ 47                                III. Conclusion

¶ 48    Defendant was not armed with a dangerous weapon as defined by the aggravated kidnaping statute. Accordingly, we reduce his conviction to kidnaping and remand for resentencing. In addition, defendant has not demonstrated that error occurred with respect to the photographs of Reese. Accordingly, we affirm the judgment in all other respects.

¶ 49    Affirmed in part and reversed in part.

¶ 50    Cause remanded.