No. 1-14-0039

2016 IL App (1st) 140039

THIRD DIVISION
May 18, 2016

No. 1-14-0039

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | 10 CR 10937 |
| BRUCE SMITH, | ) | |
| | ) | |
| Defendant-Appellant. | ) | The Honorable |
| | ) | Clayton J. Crane |
| | ) | Judge, presiding. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Mason and Justice Fitzgerald Smith concurred in the judgment and opinion.

OPINION

¶ 1      Following a jury trial, defendant Dr. Bruce Smith, M.D. was found guilty of two counts of criminal sexual assault. 720 ILCS 5/12-13(a)(2) (West 2002).  Defendant was sentenced to consecutive terms of 11 and 7 years imprisonment. On appeal, defendant contends that the State's prosecution of him was barred by the applicable statute of limitations (720 ILCS 5/3-6(e) (West 2002)) because he had a "professional" relationship with the victim.  Defendant also

1

contends that the trial court failed to properly address his posttrial allegations of ineffective assistance of counsel.  In addition, defendant contends that the trial court erred in imposing a three-year mandatory supervised release (MSR) term because the statutory MSR for such cases was only two years.  See 730 ILCS 5/5-8-1(d)(2) (West 2002). We affirm the judgment, but order the mittimus to be corrected.

¶ 2                                     BACKGROUND

¶ 3     We recite only those facts necessary to understand the issues raised on appeal. On August 2, 2002, defendant allegedly raped his patient T.T. during a gynecological examination. Approximately eight years later, on June 10, 2010, the State charged defendant with two counts of criminal sexual assault.  720 ILCS 5/12-13(a)(2) (West 2002).  Prior to trial, defendant filed a motion contending that the State was barred from prosecuting because defendant had a professional relationship with the victim, and under the applicable statute of limitations, prosecution "may be commenced within one year after the discovery of the offense by the victim."  720 ILCS 5/3-6(e) (West 2002).  The State, however, contended that the applicable statute of limitations was established in subsection (i) and allowed for a 10 year period from which to prosecute "if the victim reported the offense to law enforcement authorities within 2 years after the commission of the offense." 720 ILCS 5/3-6(i) (West 2002).  Following a hearing, the trial court denied defendant's motion to dismiss and determined the 10 year statute applied.

¶ 4     At trial, T.T. testified that at 8-months pregnant she scheduled an appointment with defendant because she had concerns about her baby.  In the examination room, defendant directed T.T. to remove her underwear and place her legs in the stirrups on the examining table. She was not given a gown or a sheet and defendant did not leave the room while she changed. Defendant was paged out of the room several times and explained that a woman thought she was

going into labor. Defendant began the examination by placing one hand on T.T.'s belly and the other inside her vagina, putting pressure on her. Defendant then began to rub T.T.'s clitoris in a circular motion, while moving his hand in and out of her vagina. T.T. recognized that this was unlike any internal examination she had ever received and was in disbelief. She next felt defendant's hands around her knees and felt him rocking back and forth against her with his penis inserted inside her vagina. She, however, did not see his penis because she always closed her eyes during gynecological examinations. When she began to comprehend what was happening, she made the "worst face ever" and defendant abruptly stopped. Defendant then walked to his desk, looked at T.T.'s file and told T.T. that he was concerned about her blood pressure and would see her next week, acting "as if nothing [had] happened."

¶ 5      After defendant left the room, T.T. wiped herself off, got dressed and immediately left the building without making a follow-up appointment. She then called her sister, Tonya, and friend, Erica Foster. Upon returning home, T.T. told the women what had happened with defendant and they encouraged her to call the police. Tonya insisted that T.T. speak with an advocate at the rape hotline who encouraged T.T. to go to the hospital to make sure her "baby was ok" and she "didn't have any diseases." At the University of Chicago Medical Center (UC Medical Center), T.T. explained what had transpired to a nurse and doctor and underwent a rape kit. She spoke with a female Chicago Police Department (CPD) officer, but did not file a formal complaint because T.T. first wanted to inform her mother and boyfriend. Approximately 15 days after the incident, T.T. filed a formal complaint. In addition, she filed a civil complaint which she later voluntarily dismissed.

¶ 6      Numerous medical professionals and law enforcement officials testified at trial. Sandra Day, a UC Medical Center emergency room nurse, collected a blood sample from T.T. along

with swabs from the sexual assault evidence collection kit. Illinois State Police (ISP) Forensic Biologist Karen Abbinanti then analyzed T.T.'s sexual assault kit and found semen on the vaginal swabs, which were preserved for further DNA testing. In addition, CPD Detective Constance Besteda obtained a search warrant to get a buccal swab from defendant and CPD Detective Dachae Blaton executed the search warrant along with defendant's buccal swab. Thereafter, ISP Forensic Biochemist Pauline Gordon confirmed that T.T.'s vaginal swab matched defendant's buccal swab. The State rested.

¶ 7    Defendant testified that after he delivered T.T.'s child in 1998 she became his patient. On the day of the incident, defendant first gave T.T. an external examination and then performed an internal examination. When defendant began to remove his hands from inside T.T.'s vagina, she placed her hand on top of his hand and guided it in and out of her vagina several times. Defendant believed this action was an "overture" and removed his pants. He then attempted to put his penis into her vagina, but was unable to do so, due to her position on the table. Consequently, T.T. slid down the table and defendant held her up as she guided her body onto his penis. No words were exchanged and T.T. did not tell defendant to stop. Defendant admitted that when he first spoke with the police and prosecutor about T.T.'s allegations he lied and said that his penis never entered T.T.'s vagina. Defendant also lied when testifying about the matter at an Illinois Department of Financial and Professional Regulation hearing because he was worried about losing his license. On cross-examination, defendant remembered being paged out of the room only once and believed the examination had concluded before the sexual relations began. He never saw or spoke to T.T. after the incident.

¶ 8    After closing arguments, the jury found defendant guilty of two counts of criminal sexual assault (720 ILCS 5/12-13(a)(2) (West 2002)). On April 23, 2013, defendant filed a *pro se*

motion for judgment notwithstanding the verdict or in the alternative a motion for a new trial alleging ineffective counsel. In response, the trial court appointed Assistant Public Defender (APD) and supervisor Lori Roper to represent defendant. At a subsequent hearing, APD Roper concluded that after reviewing defendant's *pro se* motion in detail she did not find defendant's counsel ineffective. Defendant, however, alleged that APD Roper was operating under a conflict of interest, and thus, requested "conflict-free" counsel. The trial court found no basis for any of defendant's allegations and denied his *pro se* motion. Shortly thereafter, APD Roper filed a motion for a new trial on defendant's behalf raising a speedy trial issue, which the trial court denied. Following a sentencing hearing, the trial court sentenced defendant to an aggregate total of 18 years' imprisonment: 11 years' imprisonment on count I for penis to vagina contact and 7 years' imprisonment on count II for hand to vagina contact, sentences to run consecutively. Defendant then filed this timely appeal.

¶ 9                                    ANALYSIS

¶ 10    On appeal, defendant contends that the prosecution of this case was barred by the applicable statute of limitations, and therefore, defendant's conviction should be reversed. When an appeal involves the trial court's application of the law to uncontested facts, the standard of review is *de novo*. *People v. Chapman*, 194 Ill. 2d 186, 208 (2000). The primary objective of the court in construing the meaning of the statute is to ascertain and give effect to the intention of the Illinois legislature. *People v Botruff*, 212 Ill. 2d 166, 175 (2004). Therefore, an analysis of a statute must always begin with the plain language of the provision. *People v. Jones*, 214 Ill. 2d 187, 193 (2005). "Words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute." *People v. O'Brien*, 197 Ill. 2d 88, 91 (2001). In construing a statute, a court may also consider the reason and necessity for the

laws, the evils to be remedied, and the objectives and purposes to be obtained. *People v. Woods*, 193 Ill. 2d 483, 487 (2000).

¶ 11    The State charged defendant with 2 counts of criminal sexual assault, under which the defendant "commits an act of sexual penetration" knowing that the victim "[i]s unable to give knowing consent."  720 ILCS 5/12-13(a)(2) (West 2002).  Further, under section 5/3-6(i), the period within which a prosecution must be commenced is extended under the following condition:

¶ 12    "(i) *** a prosecution for criminal sexual assault, aggravated criminal sexual assault, or aggravated criminal sexual abuse may be commenced within 10 years of the commission of the offense if the victim reported the offense to law enforcement authorities within 2 years after the commission of the offense."  720 ILCS 5/3-6 (i) (West 2002)

In addition,

"a prosecution for any offense involving sexual conduct or sexual penetration *** where the defendant was within a professional or fiduciary relationship or a purported professional or fiduciary relationship with the victim at the time of the commission of the offense may be commenced within one year after the discovery of the offense by the victim."  720 ILCS 5/3-6(e) (West 2002).

¶ 13    Here, both parties agree that T.T. reported her sexual assault to police a few weeks after the incident.  As such, the State's prosecution of defendant meets the statutory guidelines under section 5/3-6 (i) because criminal sexual assaults must be reported to "authorities within two years after the commission of the offense" and the prosecution "commenced within 10 years of the commission of the offense."  720 ILCS 5/3-6(i) (West 2002).  Although the State's decision to wait eight years to charge defendant is surely baffling, the legislature's enactment of a ten year

window provides a proper, legal basis for that decision. In addition, while defendant contends that since he was in a professional relationship with the victim the statute of limitations under section 5/3-6(e) (720 ILCS 5/3-6(e) (West 2002)) applies, the Illinois legislature has given prosecutors options in exercising their broad discretion to decide which charges to file and how to prosecute. See *People v. Peterson*, 397 Ill. App. 3d 1048, 1055 (2010) ("[a] prosecutor has broad discretion in deciding whether to file charges and which charges to file"); *People v. Hall*, 311 Ill. App. 3d 905, 911 (2000) ("[a] prosecutor's discretion to charge is broad, and in some circumstances the prosecutor may file additional and harsher charges against a defendant"). Further, the plain language of section 5/3-6(e) reads "may be commenced," and thus, on its face the statute does not read as a blanket provision under which to charge all medical professionals. (720 ILCS 5/3-6(e) (West 2002)). And we agree with the State's view that the legislature clearly did not intend to provide extra protection for doctors who commit sexual assaults against their patients.

¶ 14 Furthermore, defendant was charged with two counts of criminal sexual assault, which did not require the State to prove a professional relationship between defendant and T.T. Although the jury instructions mentioned that defendant was a medical professional, the instructions were given to establish whether the alleged assault was in fact part of the medical examination or whether T.T.'s consent to the examination was vitiated such that defendant's conduct was a sexual assault. In other words, to prosecute a physician under the sexual assault statute, the State has the burden of establishing "what the reasonable medical standards were, that the physician intentionally transgressed those standards, and that the patient did not consent to the transgressions." *People v. Burpo*, 164 Ill. 2d 261, 264-65 (1995). In this case, the jury determined that defendant's conduct was a sexual assault for which T.T. did not give knowing

consent as opposed to a routine medical examination. Accordingly, the State was within its discretion to proceed under section 5/3-6(i) (720 ILCS 5/3-6(i) (West 2002)) and the trial court properly construed the applicable statute of limitations.

¶ 15    Defendant also contends that the trial court failed to adequately conduct a *Krankel* inquiry into defendant's posttrial claims of ineffective assistance of counsel. When faced with a *pro se* post-trial motion alleging ineffective assistance of trial counsel, a trial court makes a *Krankel* inquiry (*People v. Krankel*, 102 Ill. 2d 181 (1984)), which examines the factual basis of the claim to determine whether an appointment of counsel is warranted. *People v. Moore*, 207 Ill. 2d 68, 78 (2003). If a defendant's claims, however, "indicate that trial counsel neglected the defendant's case," the trial court must appoint new counsel. *People v. Ramey*, 152 Ill. 2d 41, 52 (1992). A trial court may base its decision in a *Krankel* inquiry on: (1) trial counsel's answers and explanations; (2) a brief discussion between the trial court and the defendant; or (3) its knowledge of trial counsel's performance at trial and the insufficiency of the defendant's allegations on their face. *People v. McLaurin*, 2012 IL App (1st) 102943, ¶ 40. The issue of whether the circuit court properly conducted an initial *Krankel* inquiry presents a legal question that we review *de novo*. *People v. Jolly*, 2014 IL 117142, ¶ 28. But if the trial court has reached a determination on the merits of a defendant's ineffective assistance of counsel claim in a *Krankel* inquiry, we will reverse only if the trial court's action was manifestly erroneous. *People v. McCarter*, 385 Ill. App. 3d 919, 941 (2008). Manifest error is error which is "clearly, evident, plain and indisputable." *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997).

¶ 16   In the case *sub judice*, after receiving defendant's *pro se* motion of ineffective assistance of counsel, the trial court immediately determined that the circumstances warranted an appointment of counsel and APD Roper was appointed from the Public Defender's Office. Thus, the trial

court did comply with the first stage of the *Krankel* inquiry by appointing defendant counsel. See *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 71 (the purpose of a nonadversarial preliminary *Krankel* inquiry is to determine whether to appoint counsel on defendant's *pro se* claims).

¶ 17    We now look to determine whether defendant was "functionally unrepresented" by APD Roper and whether the trial court's denial of defendant's *pro se* motion was manifestly erroneous. APD Roper appeared at the May hearing on defendant's *pro se* motion, requesting a continuance to review the transcripts and filings.  APD Roper then appeared on defendant's behalf at the September hearing and relayed to the court that she had thoroughly reviewed the *pro se* motion and underlying case, spoken to the necessary parties, and "according to [her] office policy and the policy according to case law," she did not find any ineffective assistance.  Thereafter, defendant amended his *pro se* motion and filed a subsequent motion seeking conflict-free counsel, alleging that APD Roper was unwilling to represent him because as an APD supervisor there was a conflict of interest given her relationship with defendant's trial counsel.  The trial court, however, determined there was no conflict of interest.  The court noted that "[a]lthough the outside perception from somebody who doesn't do this all the time may be that [APDs] back each[other] up.  I have to tell you if you came and looked at my post-conviction call . . . and the degree with which members of the Public Defender's Office represent their clients, I don't find a conflict."  Therefore, the trial court did not find it necessary to appoint an independent third party, but allowed defendant leave to hire new counsel.  In addition, APD Roper filed a motion for a new trial based on defendant's right to a speedy trial.  Thus, we agree with the trial court that the record suggests no conflict of interest existed and cannot say counsel's refusal to pursue unmeritorious claims establishes incompetent or unwilling representation.  See *People v. Wilson*,

164 Ill. 2d 436, 454 (1994) (counsel's failure to file a motion does not establish incompetent representation, especially when that motion would be futile).

¶ 18    Moreover, based on the record before us the trial court's denial of defendant's *pros se* motion was not manifestly erroneous.  The trial court noted it reviewed all necessary documents, presided over the trial, heard witness testimony, and observed "the strategies used by various attorneys as they tried the case."  And thus, the trial court "found nothing to indicate" any error on defense counsel's part based on allegations contained in defendant's *pro se* motions, allegations that were "outside the purview of the jury" and would not have changed "the results of the trial."  See *McLaurin*, 2012 IL App (1st) 102943, ¶ 40 (trial court may base its decision in a *Krankel* inquiry on its knowledge of trial counsel's performance at trial).  Therefore, the record demonstrates no clear error and the trial court properly denied defendant's *pro se* motion.

¶ 19    Finally, defendant maintains that the mandatory supervised released ("MSR") term for a Class 1 felony, such as criminal sexual assault, is 2 years; however, the trial court imposed a three-year term.  Defendant's entitlement to a correction of his mittimus is a legal issue that is reviewed *de novo*.  *People v. Roberson*, 212 Ill. 2d 430, 437 (2004).

¶ 20    A review of the applicable sentencing statute in effect at the time when the crimes were committed supports defendant's assertion.  See 730 ILCS 5/5-8-1 (d)(2) (West 2002).  The State concedes, and this court agrees, that the proper MSR term for this case is two years.  Remand is not necessary because under Supreme Court Rule 615, this court may correct the mittimus without remanding the cause to the trial court.  See Ill. S. Ct. R. 615(b)(1); *People v. Mitchell*, 234 Ill. App. 3d 912, 921 (2009).  Thus, pursuant to Supreme Court Rule 615(b)(1), this court directs the circuit court to amend the mittimus to reflect the MSR term of two years.

¶ 21                                    CONCLUSION

¶ 22    Based on the foregoing, we affirm the judgment of the circuit court of Cook County and order that the mittimus be corrected.

¶ 23    Affirmed; mittimus corrected.